# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| PEORIA TRIBE OF INDIANS OF OKLAHOMA,  )<br>)<br>Plaintiff,  )<br>)<br>v.  )<br>)<br>STUART D. CAMPBELL;  )<br>)<br>BAXCASE, L.L.C., an Oklahoma Limited Liability Corporation;  )<br>)<br>SNEED LANG, P.C. and its successor, SNEED LANG HERROLD, P.C., Oklahoma Professional Corporations;  )<br>)<br>DOERNER SAUNDERS DANIEL & ANDERSON, L.L.P., et al.,  )<br>)<br>Defendants.  ) | Case No. 19-CV-581-TCK-JFJ |

## **OPINION AND ORDER**

Before the Court is the Motion to Remand filed by plaintiff, the Peoria Tribe of Indians of Oklahoma (the "Peoria Tribe" or "Tribe"). Doc. 24. In its motion, the Tribe argues that this case should be remanded to the District Court of Ottawa County, Oklahoma, because—contrary to the representations in the Notice of Removal and Status Report filed by defendants Stuart D. Campbell ("Campbell") and Doerner Saunders Daniel & Anderson, L.L.P. ("Doerner Saunders")—federal jurisdiction is lacking. *Id.* Defendants Campbell, Baxcase, L.L.C. and Doerner Saunders oppose the motion. Docs. 31-32.

**I. Background/Allegations of the Petition**

The Tribe filed suit against Defendants in Ottawa County District Court on September 26, 2019, alleging state law claims for legal malpractice; breach of fiduciary duty; deceit/fraudulent concealment and failure to disclose; money had and received; and unjust enrichment. Doc. 2-1, Petition at 1. Defendants removed the case to this Court pursuant to 28 U.S.C. §1332, federal question jurisdiction. Subsequently, the tribe filed the pending motion to remand.

The Tribe's Petition alleges that during the applicable period of its claims, Campbell was employed by, and was a partner/shareholder of the Sneed Lang and Doerner Saunders law firms. *Id.*, ¶¶5-6. It states that Campbell was also the sole shareholder of Baxcase, L.L.C. ("Baxcase"), a separate law firm that he used as a business entity for the performance of legal services. *Id.*, ¶4.

The Petition alleges that on or about March 2, 2004, Direct Enterprise Development, LLC ("DED"), an Oklahoma limited liability company owned and controlled by David J. Qualls and Tony D. Holden, entered into a Development Agreement with the Peoria Tribe to develop and manage the Casino for a term of five years. *Id.*, ¶12. In accordance with the Peoria Tribe's Constitution, the Agreement was approved by Resolution of the Business Committee on May 4, 2004. *Id.* On or about June 3, 2005, it was submitted to the Chairman of the National Indian Gaming Commission ("NIGC") for review and approval, as required by 25 U.S.C. §2710(d)(9), and certain paragraphs of 25 U.S.C. §2711. *Id.*

The NIGC's review of the Agreement resulted in the discovery of a separate contract between DED and Baxcase, which gave Baxcase (and, as a result, Campbell) the right to five percent of the management fee DED received under the Agreement. *Id.*, ¶13. According to the NIGC, this arrangement gave Baxcase and Campbell a financial interest in the operation of the Casino, and therefore both Campbell and Baxcase were required by 25 U.S.C §2711 and 25 C.F.R.

§533.3(d) to undergo a background investigation and suitability determination before the Agreement could be approved. *Id.*

In a February 16, 2007 letter, the NIGC also informed DED that the proposed treatment of depreciation in the Business Plan DED submitted was contrary to the Agreement, the Indian Gaming Regulatory Act ("IGRA") and applicable NGIC Regulations, and that it resulted in an inflated management fee. *Id.*, ¶14. The NGIC found that "after the initial deduction of all depreciation, the non-facility depreciation was added back into the calculation as a depreciation adjustment, thus inflating the casino's net revenue and the management fee." *Id.* Because the management fee is based on a percentage of the Net Gaming Revenue, a deduction of less than all required depreciation illegally inflated the management fee received by DED, as well as the five percent paid to Campbell. *Id.* Additionally, NIGC found that the depreciation scheme was contrary to the terms of the management agreement, and it required DED and the Peoria Tribe to explain the discrepancy. *Id.*

In a letter dated February 20, 2007, DED informed the NIGC that the compensation provision for Baxcase and Campbell had been changed to a monthly fee which was not based on a percentage of the management fees. *Id.*, ¶15. DED submitted an affidavit signed by DED co-owner Holden and a revised agreement between DED and Baxcase. *Id.* As a result, Baxcase and Campbell avoided the scrutiny of a background investigation and suitability determination. *Id.* On or about May 21, 2007, DED submitted to the NIGC a Revised Business Plan that specified DED co-owner Holden would use all depreciation in calculating Net Gaming Revenue and the related management fee owed to DED. *Id.*, ¶16. On October 1, 2007, in reliance on the Revised Business Plan, professed changes in Baxcase and Campbell's compensation, and other professed

3

changes, the NIGC Chair sent a letter to the Peoria Tribe and DED approving the Agreement for an initial term of five years. *Id.*, ¶17.

Following the NIGC's approval, the Peoria Tribe and the NIGC were led to believe, particularly by Campbell, that DED would manage and was managing the Casino in compliance with the Agreement, Revised Business Plan and other promises DED and its principals to the NIGC and the Peoria Tribe Business Committee. *Id.*, ¶18. At all material times, DED and its principals exercised sole control over the Casino and its operations. DED was obligated to comply with the Agreement, the Revised Business Plan, IGRA, the rules and regulations of the NIGC and the representations DED made to the NIGC. *Id.*, ¶19. As attorney for the Peoria Tribe, Campbell was required to report to the Peoria Tribe's Business Committee all violations of management agreements, business plans and promises that it made to the NIGC, as well as any of IGRA and NIGC's rules and regulations. *Id.*

On or about February 7, 2012, the term of the Agreement, with some modifications, was extended through October 7, 2017. *Id.*, ¶20. Changes to the Agreement did not relate to how depreciation was to be treated in calculation of the management fee, or the manner in which Baxcase and Campbell were to be compensated by DED. *Id.* The 2012 Agreement was subsequently approved by the NIGC on September 13, 2012. *Id.* During this process, neither DED nor Campbell reported to NIGC or the Peoria Tribe Business Committee any changes in the manner in which Baxcase and Campbell were being compensated, or in the manner in which DED was calculating its management fee. *Id.*

Campbell acted as attorney for the Peoria Tribe in connection with the casino operations and litigation from 2005 until at least May of 2018, providing continuous representation of the Peoria Tribe for all legal matters involving the Casino. *Id.*, ¶21. He represented the Peoria Tribe

4

and the Casino, initially while employed by Sneed Lang, and later by Doerner Saunders. *Id.* Both firms billed and were paid by the Casino for Campbell's services to the Peoria Tribe. *Id.* As the Peoria Tribe's and the Casino's legal representative and fiduciary, Campbell had a continuous duty to exercise the ordinary skill, due care and knowledge of an attorney purporting to have specialized knowledge in Indian law and particularly Indian gaming, a highly regulated industry. *Id.* Those duties included protecting the Peoria Tribe and Casino from injury, including from violations of the agreement approved by and the promises made to NIGC, as well as IGRA and its accompanying regulations, and to report any violations to the Business Committee. *Id.* The Peoria Tribe and its Business Committee innocently relied on Campbell to fully perform those duties. *Id.*

Approximately a year after the NIGC approved the Agreement in 2007, DED—without notice to or approval of either the Business Committee or NIGC, but with Campbell's knowledge and approval—secretly abandoned the modifications in the Revised Business Plan and reverted to the illegal and previously disapproved treatment of depreciation, thereby inflating its management fees. *Id.*, ¶22. In October of 2008, Campbell—again without the Business Committee's knowledge or approval—assisted DED in making this change by submitting to DED co-owners Holden and Qualls a memo supporting the use of the disapproved depreciation treatment, thereby inflating its management fees. *Id.* In doing so, Campbell misrepresented the requirements of the NIGC-approved Agreement and the Revised Business Plan, as well as IGRA and NIGC regulations. *Id.* With Campbell's knowledge, DED made this illegal depreciation scheme retroactive, resulting in the payment of inflated past and future management fees. *Id.* The inflation of the management fee directly violated promises made to the NIGC to secure the approval of the Agreement. *Id.*

Over the life of the DED management agreements, the change in calculation of depreciation and the related increase in the management fee resulted in overpayment to DED of management fees in the amount of $2,067,561.00. *Id.*, ¶23. On information and belief, sometime during 2008, DED also secretly reverted to paying Baxcase and Campbell a percentage of DED's management contract fees, thus giving them a direct financial interest in the management of the Casino, contrary to the 2007 representations made by DED to the NIGC to secure approval of the Agreement. *Id.*, ¶24. This also resulted in Campbell profiting from the inflated management fees. *Id.* Campbell did not notify the NIGC or the Business Committee of this change. *Id.* Campbell's failure to give notice of his management interest to the NIGC and the Peoria Tribe enabled both Campbell and Baxcase to operate without required oversight by the NIGC and the Peoria Tribal Gaming Commission. *Id.*

The reinstatement of Campbell's and Baxcase's practice of receiving a percentage of the management fee and giving them a financial interest in the Peoria Tribe's Agreement with DED constituted a modification or amendment of the Agreement under 25 C.F.R. §535.1(c)(4). *Id.*, ¶25. In violation of IGRA and NIGC regulations, DED and Campbell concealed from the NIGC and the Peoria Tribe the changes in the calculation of the Net Gaming Revenue and the resulting management fees, as well as the changes in the payments paid to Baxcase and Campbell. *Id.*, ¶26. Campbell and DED did not notify the Peoria Tribe Business Committee of these changes, nor did they seek approval of them. *Id.* Additionally, they failed to submit to the NIGC an updated list of entities and individuals with a financial interest in the Agreement, as required by IGRA and NIGC regulations. *Id.* Campbell failed to inform the Business Committee of these changes or their financial impact on the Peoria Tribe. *Id.*

As an attorney for the Peoria Tribe, Campbell had a duty to inform the NIGC and the tribe of the reimplementation of the depreciation scheme, and his and Baxcase's receipt of a percentage of the management fee. *Id.*, ¶27. Campbell also knew or should have known that the failure to report these changes to the NIGC placed his client, the Peoria Tribe, at risk of having NIGC sanctions imposed on the Casino operations. *Id.* Campbell further knew, or should have known, that the change in the manner in which the management fee was calculated was detrimental to the financial interest of his client, the Peoria Tribe. *Id.* Campbell's fiduciary duty to the Peoria Tribe imposed on him a continuous duty to act to prevent and/or to report such changes to the Peoria Tribe's Business Committee. *Id.* Campbell either negligently or intentionally continuously failed to meet his fiduciary obligations to the Peoria Tribe. *Id.*

The changes in the calculation of the management fees and compensation of Baxcase and Campbell continued from 2008 until at least the time of their discovery by the NIGC in 2017 and the resulting notification of the Business Committee, led to a continuing loss of income and damage to the Peoria Tribe. *Id.*, ¶28. The Business Committee first learned of the unlawful actions by Campbell, Baxcase, DED, Qualls and Holden when its members received copies of a September 28, 2017 letter from the Chair of the NIGC to DED, Qualls and the Peoria Tribe's Chief. *Id.*, ¶29. That letter informed the Business Committee of the wrongful actions of DED, its resulting receipt of excess management fees contrary to its agreements with the Peoria Tribe and Baxcase, and Campbell's financial interest in the management of the Casino. *Id.*

The Business Committee and the Peoria Tribe were never advised of, and never approved Campbell's, Baxcase's and DED's action in unlawfully diverting the Casino profits directly to themselves by this illegal and unapproved scheme. *Id.*, ¶30. Qualls and Holden had sole control over the management of the Casino and distribution of its earnings. *Id.* Campbell never advised

the Business Committee of the illegal diversion of the Peoria Tribe's income by these practices. *Id.* Campbell, by his actions and inactions, aided and abetted DED, Qualls and Holden in violating the terms of the approved management agreements and the unlawful receipt of the inflated management fee. *Id.*

During the period from 2008 through 2018, Campbell—through his actions or inactions—led the Business Committee to believe and rely on the belief that the Casino was operating in a lawful manner consistent with the approved management agreements. *Id.*, ¶31. In doing so, he negligently or intentionally concealed and/or misrepresented material facts of which he had knowledge. *Id.*

Throughout his tenure as counsel for the Casino and the Peoria Tribe, Campbell negligently or intentionally failed to disclose his past misconduct and/or the concealment of his role in the illegal calculation of the management fee and his illegal receipt of a percentage of that management fee. *Id.*, ¶32. Campbell, in failing to apprise the Business Committee of the Peoria Tribe of the unlawful actions of DED, Qualls, Holden and himself in the operation of the Casino, violated his fiduciary duties of loyalty, trust and confidence to the Peoria Tribe and the Casino, as well as Rules 1.3, 1.4, 1.7, 1.8 and 5.7(a) of the Oklahoma Rules of Professional Conduct. *Id.* Campbell's misconduct also included his continuing failure to disclose his assistance to DED, Qualls and Holden in actions which were directly adverse to the Peoria Tribe and the Casino. *Id.*

During the applicable period of the allegations made, at various times Campbell was an employee of the law firms Sneed Lang and Doerner Saunders (as well as Baxcase) and subject to their control, and/or was performing duties that may be reasonably said to have been contemplated as part of his employment by the respective law firms. *Id.*, ¶33. During the applicable period of the allegations, Sneed Lang and Doerner Saunders represented Campbell as a member, as well as

8

a partner or shareholder of their respective law firms. *Id.* Campbell had actual and/or apparent authority of those law firms in the performance of legal services for the Peoria Tribe. *Id.* The performance of legal services by Campbell was within the scope of authority of Campbell as an attorney even if not expressly authorized by the law firms. *Id.* Thus, the actions or omissions of Campbell during the applicable period of the allegations are the acts or omissions of the respective law firms during Campbell's time of employment with each such law firm, and each may be respectively liable for the actions or omissions of Campbell during the applicable period of employment. *Id.*

As the result of Campbell's negligent and/or intentional actions and inactions, the Peoria Tribe was damaged in the amount of $2,067.561.10, plus interest, for the payment of excessive management fees and other damages, and Campbell and Baxcase were directly unjustly enriched due to Campell's increased fees in an amount in excess of $100,000.00. *Id.*, ¶¶34-35.

Additionally, as a result of the wrongful actions of Campbell, including his failure to disclose to the Peoria Tribe Business Committee the illegal operation of the Casino, the Peoria Tribe received a Notice of Violation (NOV #19-03) from the Chairman of the NIGC dated May 10, 2019, which identified the violations referenced in the Complaint, as well as other violations. *Id.*, ¶36.

The Chairman of the NIGC has the authority to levy and collect civil fines, not to exceed $52,596.00 per violation, against the tribal operator of an Indian game or a management contractor engaged in gaming for any violation of any provision of IGRA, any regulation prescribed by the Commission pursuant to this Act, or tribal regulations, ordinances or resolutions approved under the Act. 25 U.S.C. §273(a)(1); 25 C.F.R. §2713(a)(1); 25 C.F.R. §575.4. *Id.*, ¶37. The NOV

alleges that Campbell, Baxcase, Qualls, Holden and DED committed 77 violations of IGRA and the regulations of the NIGC. *Id.*

As of the date of the filing of the Petition, the NOV has not been resolved, and the final amount of such a civil fine imposed against the Peoria Tribe for the improper operation of the Casino has yet to be determined. *Id.* ¶38. However, the Peoria Tribe asserts that the imposition of any such fine was proximately caused by the actions and/or inactions of Campbell, and that Campbell, Sneed Lang and Doerner Saunders should be made liable for any such penalty as damages in this action, along with attorney fees, and costs of defense. *Id.* ¶¶38-39. Pursuant to 23 O.S. §9.1, the Peoria Tribe also seeks punitive damages against Campbell. ¶40.

The Peoria Tribe asserts the following claims against Defendants:

- Legal Malpractice;

- Alternative Claims for Breach of Fiduciary Duty and/or Deceit/Fraudulent Concealment and Failure to Disclose;

- Money Had and Received; and

- Unjust Enrichment.

*Id.* at ¶¶41-64.

The Tribe seeks:

1. actual damages of $2,067,561.00, plus interest, against Campbell and Baxcase for illegal and inflated management fees paid by the Peoria Tribe;

2. a money judgment against Campbell and Baxcase in the amount of any civil penalty imposed by the Chairman of the NIGC arising out of the NOV;

3. a money judgment against Campbell and Baxcase for any attorney fees, costs and expenses incurred by the Peoria Tribe in responding to the NOV;

4. a money judgment against Sneed Lang and Doerner Saunders, to be apportioned according to the period during which Campbell was employed by and/or acted on behalf of each law firm and the Peoria Tribe for the total amount of the illegal and inflated management fees paid by the Peoria Tribe, plus interest; the amount of any civil penalty imposed by the

    Chairman of the NIGC arising out of the NOV issued by the Chairman of the NIGC; and the amount of any attorney fees, costs and expenses incurred by the Peoria Tribe in responding to the NOV issued by the Chairman of the NICG, in an amount no less than $2,067,561.00;

5. an award of punitive damages against Defendants as appropriate in an amount of no less than $2,067,561.00;

6. a money judgment against Campbell and Baxcase in an amount believed to be no less than $100,000.00, plus interest, for the payments they received pursuant to the illegal agreement that they receive a percentage of the management fee; and/or an order of the Court that Campbell and Baxcase pay to the Peoria Tribe the monies wrongfully in their possession, believed to be no less than $100,000.00, plus interest and punitive damages as proven;

7. costs of this action; and

8. such other and further relief as the Court finds just and equitable.

Doc. 2-1 at pp. 16-18.

**II. Standard of Review**

    A defendant may remove to the appropriate federal district court any civil action over which district courts have original jurisdiction, including cases "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. A cause of action "arises under" federal law when "the plaintiff's well-pleaded complaint raises issues of federal law." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 163 (1997). "For statutory purposes, a case can 'aris[e] under' federal law in two ways." *Gunn v. Minton*, 568 U.S. 251, 257 (2013). First, "a case arises under federal law when federal law creates the cause of action asserted. *Id.* Second, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.* at 258 (citing *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 314 (2005)).

    The Tenth Circuit has stated that "statutes conferring jurisdiction upon the federal courts, and particularly removal statutes, are to be narrowly construed in light of our constitutional role as

limited tribunals." *Pritchett v. Office Depot, Inc.*, 420 F.3d 1090, 1094-95 (10th Cir. 2005). The removing party bears the burden to prove the existence of federal subject matter jurisdiction. *Martin v. Franklin Capital Corp.*, 251 F.3d 1284, 1290 (10th Cir. 2001). "There is a presumption against removal jurisdiction," and doubtful cases must be resolved in favor of remand. *Laughlin v. Kmart Corp.*, 50 F.3d 871, 873 (10th Cir. 1995); *Pritchett*, 420 F.3d at 1097.

### III. Analysis

In their Notice of Removal, Defendants assert that since the Peoria Tribe's Petition alleged specific violations of federal laws and regulations, the matter involves a federal question pursuant to 28 U.S.C. §§1331 and 1441. Doc. 2 at 3. Citing, *inter alia*, *Gunn*, the Tribe disagrees.

"Federal courts are courts of limited jurisdiction" and possess "only that power authorized by Constitution and statute." *Gunn*, 568 U.S at 256. The Supreme Court has stated that, "[i]t is to be presumed that a cause lies outside this limited jurisdiction and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Furthermore, "[b]ecause arising-under jurisdiction to hear a state-law claim always raises the possibility of upsetting the state-federal line drawn . . . by Congress, the presence of a disputed federal issue and the ostensible importance of a federal forum are never necessarily dipositive; there must always be an assessment of any disruptive portent in exercising federal jurisdiction." *Grable*, 545 U.S. at 314.

The Supreme Court has declined to state a "single, precise, all-embracing" test for jurisdiction over federal issues embedded in state-law claims between nondiverse parties." *Christianson v. Colt Industries Operating Corp.*, 486 U.S 800, 821 (1988). However, it has held that the appropriate inquiry is whether "the 'state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing

any congressionally approved balance of federal and state judicial responsibilities.'" *Grable*, 545 U.S. at 314.  Accordingly, "federal jurisdiction over a state law claim will lie if a federal issue is (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258, (citing *Grable*, 545 U.S. at 313-314).

Here, it is undisputed that the Tribe's claims for legal malpractice; its alternative claims for breach of fiduciary duty, deceit/fraudulent concealment and failure to disclose, money had and received, and unjust enrichment; and its punitive damages claim all arise under state law. Nonetheless, Defendants argue that because the claims arose in the context of Indian gaming operations, the four *Grable* factors for federal question jurisdiction are satisfied, and the case was properly removed to federal court.

The Supreme Court's opinion in *Gunn* guides the Court's consideration of the pending motion.  There, the plaintiff sued his former attorneys in Texas state court, asserting a claim for legal malpractice based on their alleged mishandling of a federal patent infringement suit.  568 U.S. at 253.  The Supreme Court of Texas ultimately determined that plaintiff's claim involved "a substantial federal issue" and adjudication of the claim in federal court was consistent with the appropriate balance between federal and state officials because "'the federal government and patent litigants have an interest in the uniform application of patent law by courts well-versed in that subject matter.'"  *Id*. at 256 (citation omitted).

The Supreme Court—citing *Grable*—reiterated that federal jurisdiction will lie if the "state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id.* at 258.  It stated, in pertinent part:

13

> [I]t is not enough that the federal issue be significant to the particular parties in the immediate suit; that will *always* be true when the state claim 'necessarily raise[s]' a disputed federal issue, as *Grable* separately requires." *Id.* at 260. Instead, "[t]he substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal system as a whole.

*Id.* at 260. The Court emphasized that "the relevant point was not the importance of the question to the parties alone but rather the importance more generally of a determination that the Government 'securities were issued under an unconstitutional law, and hence of no validity.'" *Id.* It stated:

> "(B)ecause of the backward-looking nature of a legal malpractice claim, the question is posed in a merely hypothetical sense: *If* Minton's lawyers had raised a timely experimental-use argument, would the result in the patent infringement proceeding have been different? No matter how the state courts resolve that hypothetical "case within a case," it will not change the real-world result of the prior federal patent litigation. Minton's patent will remain invalid.

*Id.* (emphasis in original). Furthermore, the Court found that trying the malpractice claims in federal court could disrupt the federal-state balance approved by Congress, because states "have 'a special responsibility for maintaining standards among members of the licensed professions.'" *Id.* at 264 (citing *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 460 (1978)). It concluded, "We have no reasons to suppose that Congress—in establishing exclusive federal jurisdiction over patent cases—meant to bar from state courts state legal malpractice claims simply because they require resolution of a hypothetical patent issue." *Id.*

In *Becker v. Ute Indian Tribe of the Uintah and Ouray Reservation*, 770 F.3d 944 (10th Cir. 2014), plaintiff, a contractor for the Ute Indian Tribe of the Uintah and Ouray Reservation, sued the tribe in the United States District Court for the District of Utah, alleging claims for breach of contract , breach of covenant of good faith and fair dealing, and accounting claims. The tribe moved for dismissal pursuant to Fed. R. Civ. P. 12(b)(1) and Rule 12(b)(6). Plaintiff asserted that the district court had federal jurisdiction because the case raised substantial issues of federal law,

14

including (1) whether the contract required approval by the United States Secretary of the Interior under 25 U.S.C. §§81 or 2103; (2) whether the contract was a valid "Minerals Agreement" under the Indian Mineral Development Act of 1982, 25 U.S.C. §§2101-2108; (3) whether the tribe could invoke sovereign immunity; and (4) whether the tribe had agreed to submit to the district court's jurisdiction. *Id.* at 946. The district court granted the tribe's motion to dismiss for lack of subject matter jurisdiction, reasoning that federal question jurisdiction cannot depend solely on federal defenses and concluding that plaintiff's complaint did not raise a substantial question of federal law. *Id.*

On appeal, the Tenth Circuit—citing *Gunn*—acknowledged that even where a claim finds its origins in state law rather than federal law, as did plaintiff's claims, the Supreme Court has identified "'a special and small category' of cases in which arising under jurisdiction still lies." *Id.* at 947. However, applying the four-part analysis set out in *Gunn*, the court concluded that Becker's federal issues were "merely federal defenses, which do not give rise to federal question jurisdiction under 28 U.S.C. §1331." *Id.* at 948.

Similarly, in the wake of *Gunn*, courts in other jurisdictions have declined to permit removal of malpractice suits involving federal issues. *See*, *i.e.*, *NeuroRepair, Inc. v. Nath Law Group*, 781 F.3d 1340, 1348 (Fed. Cir. 2015) (holding that federal jurisdiction of a lawsuit alleging attorney malpractice was lacking because, *inter alia*, "the resolution by federal courts of attorney malpractice claims that do not raise substantial issues of federal law would usurp the important role of state courts in regulating the practice of law within their boundaries, disrupting the federal-state balance approved by Congress"); *Alps South, LLC v. Shumaker, Loop & Kendrick, LLP,* No. 17-cv-1634-SDM-CPT, 2018 W 4522168 at **2-3 (Fed. Cir. 2018) (upholding district court's dismissal of lawsuit alleging malpractice claim against patent attorney and noting that trying

attorney malpractice case in federal court could interfere with state's "strong interest in having its own courts ensure the competence of the attorneys who counsel Floridians").

The same reasoning applies in this case. Accepting, for purposes of the pending motion, that the hypothetical "case within a case" involves the Notice of Violation issued by IGRA, defendants have failed to demonstrate the resolution of the Tribe's malpractice claim against the attorneys will have any effect on Indian gaming laws in general or on IGRA's claims against the Tribe.

### IV. Conclusion

Accordingly, the Tribe's Motion to Remand (Doc. 25) is granted, and the Court Clerk is directed to remand this action to the District Court for Ottawa County, Oklahoma.

ENTERED this 28th day of July, 2020.

TERENCE C. KERN
United States District Judge